UNITED STATES of America, Appellee,

v.

Joseph M. McCRANE, Jr., Appellant.

No. 75–1643.

United States Court of Appeals,
Third Circuit.

Argued Oct. 31, 1975.

Submitted upon Remand from Supreme Court Aug. 2, 1976.

Decided Nov. 22, 1976.

Edwin P. Rome, Thomas A. Bergstrom, Jerome R. Richter, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for appellant; J. Robert Lunney, Lunney & Crocco, New York City, of counsel.

---

John J. Barry, Bruce I. Goldstein, Mary-Anne T. Desmond, Asst. U.S. Attys., Jonathan L. Goldstein, U.S. Atty., Newark, N.J., for appellee.

Before GIBBONS, Circuit Judge, MARKEY,* Chief Judge of Court of Customs and Patent Appeals, and WEIS, Circuit Judge.

## OPINION ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

PER CURIAM:

The government petitioned for certiorari from our decision in *United States v. McCrane,* 527 F.2d 906 (3d Cir. 1975), and on June 30, 1976, the Court granted certiorari, vacated our judgment, and remanded the case for further consideration in the light of *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). We requested and received the parties' views of that opinion's effect on the case *sub judice.* After careful analysis of *Agurs,* we conclude that it does not require alteration of our original decision.

The Supreme Court's opinion discussed the prosecutor's obligation to disclose evidence in his possession that would be material to the defense. The standard of materiality varies in three described situations where:

1. The prosecution used perjured testimony;

2. The defense requested specific evidence;

3. The defense made no request, or only a general one, for exculpatory material.

In the first situation, typified by such cases as *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), the convictions must be set aside if there is any reasonable likelihood that the

false testimony could have affected the judgment of the jury. This strict standard is applicable because the truth-seeking function of the trial has been compromised and prosecutorial misconduct was present.

In the second category, the Court analyzed *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), where the defense had made a pretrial request for specific exculpatory evidence, and stated:

"[I]f a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." 427 U.S. at 106, 96 S.Ct. at 2399.

Finally, if no request is made, or if it is couched in such broad terms as "all *Brady* material" or for "anything exculpatory," the Court prescribed a third standard. In this context, to establish a constitutional violation, the defendant need not carry the severe burden of demonstrating his probable acquittal. As the Court phrased it:

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. . . . [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. . . . If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. at 112, 96 S.Ct. at 2401.

*Agurs'* applicability to the case at bar is subject to some doubt since we are concerned only with impeaching evidence. As the Supreme Court noted, *Agurs* "involve[d] no misconduct, and . . . there [was] no reason to question the veracity of any of

allegations. *See Steinman v. Spector Freight System, Inc., supra,* 441 F.2d at 604. Other than the jurisdictional question, moreover, *see* note 1 *supra,* we are not passing upon any

other defenses to appellants' suit that may be raised by appellee. *See* 441 F.2d at 604 n. 9.

* Sitting by designation.

the prosecution witnesses. . . . ." 427 U.S. at 104, 96 S.Ct. at 2397. It may be questioned, therefore, whether there has been any change in the *Giglio* standard when only impeaching evidence is under scrutiny. *See United States v. Sutton,* 542 F.2d 1239 (4th Cir. 1976); *Brach v. United States,* 542 F.2d 4 (2d Cir. 1976). Nevertheless, since the case has been remanded, we re-examine the record under the *Agurs* test and assume its applicability.

The evidence is set forth in our original opinion at 527 F.2d 906 (3d Cir. 1975). We need only touch on some pertinent matters now. The indictment charged the defendant with conspiracy and with ten counts alleging that he aided and assisted various companies in making improper income tax deductions. The defendant allegedly advised certain donors to a political campaign that he would have false invoices for advertising services sent to them so they could deduct the disguised contributions as business expenses. The trial judge, at the conclusion of the government case, dismissed the conspiracy count and six substantive counts when the principals of the business concerns named in the respective counts of the indictment had not testified.

A witness named Mendelson furnished the tie-in testimony on Counts III and IV, and Bellante that for X and XI. Only Bellante's testimony saved the latter two counts from dismissal.

Bellante testified that he had a telephone conversation with McCrane in June, 1969. After indicating a willingness to make a contribution, Bellante was told how it would be done:

"He [McCrane] said that a firm by the name of Bofinger-Kaplan, which was an advertising firm, would be sending me an invoice which would be able to be deducted as an expense for Internal Revenue purposes. * * * Well, I meant that he didn't use those words, what I meant was that it was an invoice that would be able to be expensed on the books. That would be a better way of saying it."

Although Bellante said he expected to receive services from the Bofinger firm, none were performed and his corporation deducted the amount of the invoice. Some months later, he agreed to make another contribution and, at his request, received an invoice directed to him personally. The amount of this bill, he said, was not intended to be paid by his corporation, Bellante, Clauss, Miller & Nolan, Inc., but by a partnership. He said that through inadvertence the invoice was paid by a corporate check and subsequently included in the amount deducted on the corporate return as a business expense.

Bellante's testimony was thus a slender reed indeed to support the government's case. Some five years had lapsed between the conversation and trial, and the accuracy of his recollection was vital. Lawyers and judges are well aware that subconscious factors may affect a witness' memory and cause inaccuracies to creep in even without any wrongful intent. In such circumstances, prospects of favorable treatment or financial gain are matters which must be weighed.

As we noted in our original opinion, the letters written by the United States Attorney on Bellante's behalf could be characterized as factual recitations containing no evidence of any understanding between the witness and the prosecutor's office or any expectation of favor. Nevertheless, we cannot exclude the other equally reasonable inference that merely writing the letters in the circumstances here was preferential treatment. Moreover, knowledge of these letters would have opened other obvious avenues of inquiry into the relationship between the witness and the United States Attorney's office from the onset of the prosecution.

What the defendant actually said to Bellante and what the remarks were intended to convey were crucial. As the excerpt from his testimony indicates, Bellante was equivocal. In this posture of the case, evidence of favoritism by the government could be the decisive factor in the jury's acceptance or rejection of Bellante's testimony. Indeed, all that was needed for acquittal was for the jury to doubt the accuracy of the witness' recollection.

█ If the request made by the defense is considered to fall in the category of the nonspecific, nevertheless this case is one where the verdict has only slight support and "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Agurs,* 427 U.S. at 113, 96 S.Ct. at 2402. While that test has been met, alternatively we believe that materiality should be judged by the specific request standard.

*Agurs* established a less stringent test to be applied when the defense requests specific evidence. In that situation, if there is a "substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." 427 U.S. at 106, 96 S.Ct. at 2399.

█ In this context, we must examine in detail the circumstances of the defense request. In February, 1974, the defendant filed a motion covering a number of pretrial matters, among which were requests for grand jury testimony, copy and inspection, and discovery. Included in the motion was a request for exculpatory material, or anything leading to exculpatory material, and

"[M]aterial which may be used to impeach prosecution witnesses, including but not limited to any standards used by the Department of Justice, the Treasury Department, the Internal Revenue Service or the United States Attorney in declining prosecution of similar cases."

The government's response, stated in part:

"Nevertheless, the Government is acutely aware of its continuing obligations, as outlined by the Supreme Court in *Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), to disclose to the defendant throughout all stages of this proceeding any material that would exculpate it or negate its guilt."

A hearing on the pretrial motion was held before the chief judge of the District of New Jersey[1] on April 9, 1974. Defense counsel reminded the judge that he had reviewed the investigative file of the United States Attorney for *Brady* material in connection with the Gross indictment, a companion case growing out of the same factual background, and said:

"[Defense Counsel]: [W]e'd appreciate you doing it here.

[Assistant U.S. Attorney]: I'm not sure I understand.

THE COURT: Within a reasonable time of trial he wants me to make sure there is no Brady material in the Justice Department's files; in other words, not to leave it to you exclusively to decide whether it is exculpatory or not.

[Assistant U.S. Attorney]: What documents is he to examine?

THE COURT: Anything that you say—you say you have nothing at all, right?

[Assistant U.S. Attorney]: Right.

THE COURT: Nothing at all involving Brady material, right?

[Assistant U.S. Attorney]: Nothing.

THE COURT: How big is the file?

[Assistant U.S. Attorney]: Substantial file. Many, many documents.

THE COURT: Let me put it this way to you . . . If there is anything of a questionable nature, you should put it aside and let me review it in camera, and I'll decide."

The defense request designated impeaching matter, pointedly including as an example, but not a limitation, any standards used in declining prosecution of the government witnesses in similar circumstances. It requires no profound intellectual analysis to perceive that the defense was seeking material that might provide a basis for a claim of prosecutorial favoritism or preferential treatment of government witnesses. Despite a hearing on the matter and the colloquy on *Brady* material which occurred then, the government did not take the opportunity to request any clarification or narrowing of the defense' request. Instead, it took the

---

1. The case was eventually tried before a judge of the Middle District of Pennsylvania.

position that there was "nothing" involving *Brady* material in the file.

In its brief on remand, the government contends that the defense request was not specific under the *Agurs* case. It does, however, concede:

"It is not contended that the request should have been so specific as to identify the letters by date or by addressee. The request in the government's view would have been sufficiently specific if it had requested disclosure of all promises made to the witness and all actions undertaken on the witness' behalf or at the witness' request."

It appears to us that, applying the government's standard, the request must be considered as specific. Assuming *arguendo* it need not, we think that the circumstances in this case, including the language employed by the defense, the government's adequate opportunity to explore the matter at a hearing, and the pretrial judge's admonition, all require that the request be judged by *Agurs'* specific request test. Under that standard, it is clear that there was a substantial basis for claiming that materiality existed.[2] Consequently, the United States Attorney should have produced the evidence.

After a thorough reconsideration of the record therefore, we again conclude that the convictions on Counts X and XI will be vacated and remanded for a new trial. The convictions on Counts III and IV, not having been affected by the remand, are again affirmed.

---

**2.** We think it significant that the Supreme Court was careful to note, not once but several times, during its opinion that its reasoning was based on a constitutional right, that of a fair trial guaranteed by the Due Process Clauses of the Fifth and Fourteenth Amendments and, hence, equally applicable to cases in the state and federal courts. We thus do not see *Agurs* as any attempt to diminish the supervisory powers of the district courts or courts of appeals in regulating pretrial procedures and discovery.