UNITED STATES of America ex rel. George MERRITT, Jr., Petitioner,

v.

Sidney HICKS, Superintendent, New Jersey State Prison at Rahway, and the State of New Jersey, Respondents.

Civ. A. No. 79–2194.

United States District Court, D. New Jersey.

Feb. 20, 1980.

Morton Stavis, Newark, N. J., for petitioner.

John J. Degnan, Atty. Gen. by Kenneth N. Lipstein, Deputy Atty. Gen., Princeton, N. J., for respondents.

## OPINION

MEANOR, District Judge.

George Merritt, Jr., petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeks relief from custody imposed following his third conviction for the murder of John Gleason, a Plainfield, New Jersey police officer killed during riots which erupted in that city in July 1967.

### I

#### A. Background

In July 1967, following a period of racial tension and an outbreak of assaults, arson and looting in neighboring communities, rioting broke out in various sections of the City of Plainfield. The disturbance was so severe that the Plainfield Police Department sought merely to contain it by cordoning off the areas and diverting traffic away from the neighborhoods.

On July 16, 1967, Officer John V. Gleason, a white patrolman, was directing traffic from his post at the corners of Plainfield Avenue and West Front Street. He was in full uniform and was equipped with a white riot helmet, a night stick, and a gun with ammunition. (R–9 at 2.57/10–18) At approximately 8:00 p. m., two white males informed Officer Gleason that they had been threatened and pursued by a black man wielding a hammer. (Id. at 2.56/25–2.57/21) Gleason left his post and followed the man with the hammer down Plainfield Avenue toward West Third Street, where he was encircled by a crowd variously estimated at between 20 to 40 blacks. (Id. at 2.63/4; 2.75/3; 2.119/23) At some point during the confrontation, Gleason fired several shots from his gun, wounding the man with the hammer in the arm and stomach. Gleason then turned to retreat up Plainfield Avenue, but he was pursued by the crowd, knocked to the ground, and kicked and beaten with a baseball bat, a hammer or meat cleaver, a shopping cart, rocks, bottles, boards and a club. (See id. at 2.63/20–2.64/10; 2.75/4–7; 2.119/3–2.120/6) After a few minutes, the crowd dispersed, but a smaller crowd regrouped and attacked the officer a second time.[1] Gleason died as a result of the injuries sustained in the beatings.

Twelve persons, including petitioner, were charged in four separate indictments with the murder of Gleason. The indictments were consolidated for trial and, following a jury trial before the Honorable Chester A. Weidenburner, J.S.C. from November 12 through December 23, 1968, petitioner and a codefendant were found guilty of first degree murder.[2] These convictions were reversed on appeal by the Superior Court of New Jersey, Appellate Division, in an unreported opinion dated June 23, 1971.[3] (R–3 at Ra2) The Supreme Court of New Jersey granted certification, State v. Merritt, 59 N.J. 287, 281 A.2d 800 (1971), and affirmed the decision of the Appellate Division. State v. Madden, 61 N.J. 377, 294 A.2d 609 (1972).

A second trial was conducted before the Honorable V. William DiBuono, J.S.C. and a jury from January 28 to February 15, 1974. Petitioner and codefendant Madden were again found guilty of first degree murder. In an unpublished opinion dated October 6, 1976, the Appellate Division affirmed the

---

1. There is some dispute as to the size of this second crowd. (See R–9 at 2.66/8–12; 2.76/6–12; 2.122/12–15)

2. The court entered a judgment of acquittal as to one defendant at the end of the State's case. The jury acquitted seven other defendants, and was unable to reach a verdict with respect to the remaining defendant. One of those named in the indictments was never brought to trial.

3. The reversal was grounded on matters not relevant to the issues presented in the instant petition.

conviction of Madden but reversed petitioner's conviction and remanded for a new trial.[4] (R–3 at Ra16)

A third trial of petitioner was conducted before the Honorable A. Donald McKenzie, J.S.C. in September 1977. Once again a jury found petitioner guilty of first degree murder. On October 21, 1977, Judge McKenzie denied petitioner's motions for a new trial, for a judgment of acquittal *non obstante veredicto*, and for bail pending appeal. (R–3 at Ra31; R–17) The Appellate Division affirmed the conviction in a three page opinion dated March 13, 1979 (R–3 at Ra40–42), and the New Jersey Supreme Court denied certification. *State v. Merritt*, 81 N.J. 278, 405 A.2d 823 (1979).[5] Petitioner is currently serving a life sentence at Rahway State Prison.

In the third trial, as in the previous two trials, the sole witness who identified petitioner as having participated in the attack was one Donald Frazier, a resident of the neighborhood employed as a laborer for a garbage disposal service in South Plainfield. Indeed, in his opening statement to the jury, the prosecutor stated: "Now, the State rests its case, its proofs against George Merritt/George Hollis[6] on the testimony which you will hear from Donald Frazier. You will not hear anyone else identify this defendant as having participated in that killing." (R–10 at 22/5–9)

Frazier testified that he had witnessed the beating of Gleason and that he knew some of the individuals who had participated in the attack. (R–9 at 2.113/7–2.126/18) He stated that petitioner, whom he knew as George Hollis,[7] hit Gleason with a hammer or meat cleaver during the initial attack and again during the second beating. (R–9 at 2.119/1–2.120/6; 2.122/20–2.123/17; R–11 at 3.2/5–3.6/20)

Upon returning to work on Thursday, July 20, 1967, four days after the death of Gleason, Frazier informed his employer that he had observed the attack on the patrolman and that he knew some of the individuals who were involved in the incident. (R–9 at 2.127/5–2.128/3; R–11 at 3.3/1–12; 3.90/7–15; 3.156/12–3.157/7) Thereafter,[8] two police officers, later identified as Detective (now Lieutenant) Richard J. Mason of the Union County Prosecutor's Office and Detective Thomas Walker of the New Jersey State Police, interviewed Frazier at his place of employment with respect to the circumstances surrounding Gleason's death. Frazier testified that he informed the officers that he had witnessed the beating of Gleason and that he recognized some of the persons who had participated in the attack.[9] On cross examination, Frazier specifically stated that he named petitioner during this interview as one of the individuals who was involved in the incident:

> Q When the police came to your job, —the police came to your job. Did you tell the police when they came to your job about this fellow, George Hollis?

---

4. Again, the reversal was grounded on issues not pertinent to the instant petition.

5. Petitioner also appealed to the New Jersey Supreme Court under N.J. Court Rule 2:2–1(a)(1). (R–3 at Ra43) This appeal was dismissed on May 30, 1979 pursuant to N.J. Court Rule 2:12–9.

6. Frazier knew petitioner as George Hollis. *See* note 7 *infra*.

7. Hollis was the last name of petitioner's half brother, Joe, and Frazier apparently assumed that this was also petitioner's last name. There is nothing in the record to suggest that petitioner ever used the name George Hollis.

8. It was originally believed that the interview at Frazier's place of employment occurred on July 24, 1967. It has recently been discovered, however, that this interview probably took place on July 31, 1967. *See* discussion *infra*.

9. At times, Frazier testified that he informed the officers that he knew two of the individuals who were involved in the incident (*see, e. g.*, R–9 at 2.128/6–12; R–11 at 3.55/22–55) while at other times, Frazier testified that he told the detectives that he knew three of the assailants. (R–11 at 3.93/4–10; *see also* R–11 at 3.88/7–19) During cross examination, Frazier stated that although he was "definitely sure" that he recognized two of the individuals who had participated in the attack, he could not be certain whether he had so informed the officers at the time of the July interview. (R–11 at 3.71/9–3.73/19)

A  Yes, I did.

Q  You told them about that?

A  Yes.

(R–11 at 3.83/5–10)  And later:

Q  You tell this Jury, sir, that you told the police eight days later that Hollis was involved.  Is that what you tell this Jury, right, in effect that eight days later when the police arrived at the employees' [sic] place, you told them about Mr. Hollis?  Is that your testimony?

A  Well, yes.  I did because I saw him there.

Q  So you told them eight days later, right?

A  Yes.  .   .   .

(*Id.* at 3.92/7–14) [10]

On August 16, 1967, Frazier signed a formal statement at Plainfield Police Headquarters in the presence of Detectives Richard Mason and Richard Drake of the Union County Prosecutor's Office.  The statement contained Frazier's account of the incident, and indicated that he had selected petitioner's picture from among those he had examined at the police station.  (R–3 at Ra47–49; *see* R–9 at 2.128/13–2.137/20). [11]  When asked what role petitioner had played in Gleason's death, Frazier replied that petitioner had beaten the patrolman with a hammer or meat cleaver and had thrown the instrument at the officer. [12]

### B.  Petitioner's Brady Claims

Prior to the commencement of the third trial, petitioner's attorney, [13] recognizing the importance of any information that would

bear on Frazier's credibility, requested that the prosecutor furnish any written report, internal police document or memorandum concerning the July interview at Frazier's place of employment.  (P–3 (a copy of which is attached hereto as "Appendix A")).  No such report was produced.

During pretrial proceedings, defense counsel renewed his efforts to obtain a written report of the July interview, and the following colloquy took place:

THE COURT:  Is it the representation of your office, Mr. Rachmiel, that you have no knowledge of any prior statements to the law enforcement authorities by Mr. Frazier prior to the statement of August 16 which I understand had been furnished to Counsel for defendant?

MR. RACHMIEL:  No other written statements.  There was an oral statement.  What had happened is the police had spoken to Mr. Frazier at his place of employment—this is according to Frazier's testimony at prior trials—within days or weeks or two weeks of the killing.  He spoke to them and thereafter he gave the formal statement.  I have searched my files and they're quite extensive, but I have not found any police report indicating who went to see him at work or anything to that extent.  *If I had it, I certainly would have given it to Mr. Ashley as I've given everything that I've been able to find which he has sought.*

.   .   .   .

THE COURT:  .   .   .   .  *You're to furnish [counsel for the defense] at least for the specific matters that he has re-*

---

**10.**  *See* R–11 at 3.88/7–10:

Q  You say that when the police arrived at your place of employment, you told the police about the *names of the people that were involved here*, right?

A  Yes.   .   .   .

(Emphasis added.)  *See also* R–16 at 7.30/16–25.

**11.**  Frazier stated that he had known the petitioner "for years," and that they had played on the same baseball team.  (R–3 at Ra48; *see* R–9 at 2.123/11–2.124/3)

**12.**  Frazier also identified one Donald Jones as the man who had attacked Gleason with the shopping cart.  (R–3 at Ra49)  Jones was ac-

quitted of the charges at the first trial.  During that proceeding, Frazier misidentified Jones during an in-court identification, pointing to defendant James Toland as being defendant Jones.  (*See* R–9 at 2.140/6–2.150/8; R–11 at 3.104/16–3.112/24;  3.182/18–3.185/12.)

Frazier also selected the picture of an individual whom he said resembled the person who had attacked Gleason with the baseball bat.  However, this individual was in custody at the time of the incident, and could not have participated in the beatings.

**13.**  Petitioner was represented by a different attorney at each of his three trials.

quested and I take it then to make sure we have it clear that, therefore, including the statement, that you refer to, the oral statement, whatever you have on that, the surrounding circumstances and what was said. . . .

(R–4 at 38/24–40/11; see id. at 29/7–22) (Emphasis added.)[14] However, the prosecutor repeatedly stated that such a report either did not exist, or could not be located. (See, e. g., R–4 at 39/5–24; 40/12–14; R–15 at 6.90/12–6.91/1; R–16 at 7.65/3–17.)

Following his conviction and during the pendency of his appeal to the Appellate Division of the New Jersey Superior Court, petitioner filed a motion for remand to the trial court. (Petitioner's Reply Brief to Respondents' Amended Answer, Appendix A) In his moving papers, petitioner again stressed the importance of the July interview, and argued that the prosecution had withheld evidence crucial to the credibility of Donald Frazier:

19. While there was some waffling as to how soon that meeting occurred after [Frazier] spoke to his employer (he finally agreed it was about eight days after the incident, which would have made it July 24), he persisted in his claim that he spoke to the police and gave Merritt's name to them when they visited him at his place of work.

14. In response to the prosecutor's statement that defense counsel had failed to avail himself of the opportunity to search the files stored at the prosecutor's office, Judge McKenzie stated:

Well, in discovery, it isn't the obligation of the defendant's attorney to come and look through the massive documents and papers and paraphernalia that the Prosecutor has. (R–4 at 39/25–40/4)

15. Petitioner assumed that the police had never filed a report of the July interview. This assumption was based on certain statements made by the prosecutor at the close of summations (see R–16 at 7.65/16–17; 7.70/1–5), which statements, petitioner urged, were inconsistent with the prosecutor's comments at trial to the effect that the report may have been lost or misplaced. Petitioner argued:

. . . The inescapable implication from the failure to make a report of this conference (given particularly the massive reporting of all other investigative activities in this case) was that Frazier in fact made no identification of Merritt at that interview.

20. Counsel for the defense zeroed in on this alleged meeting between Frazier and the police. If he could convince the jury that Frazier had not even met the police—or, if he had, that Merritt's name had not been mentioned—then Frazier's credibility would have been undercut even more decisively than it previously had been.

(Id., Appendix A, Affidavit of Morton Stavis ¶¶ 19, 20) (Emphasis in ¶ 19 in original; emphasis in ¶ 20 added.) However, the Appellate Division denied petitioner's request for an evidentiary hearing. (R–3 at Ra35)

In his appeal to the New Jersey Superior Court, Appellate Division, and thereafter in his petition for certification to the New Jersey Supreme Court, petitioner again argued that the prosecutor had withheld evidence which would have seriously undercut Frazier's credibility (Appellate Brief at 18–20; Petition for Certification at 7–13)[15] As stated previously, the New Jersey Superior Court, Appellate Division rejected petitioner's argument without discussion (R–3 at Ra40–42) and the New Jersey Supreme Court denied review. (Id. at Ra46)

On July 23, 1979, Merritt filed the instant petition for a writ of habeas corpus, grounding his application on substantially

\* \* \* \* \* \*

Mr. Merritt's conviction was thus obtained from a jury which did not know a matter decisive in the evaluation of Frazier's credibility, the thin reed upon which the entire conviction rests: the simple fact that the police who allegedly saw Frazier on July 24th did not think enough of his statement to prepare a report as to its contents.

(Petition for Certification at 8, 10) (Emphasis in original.)

Petitioner also argued that the State had withheld exculpatory material in failing to disclose the names of the police officers who had interviewed Frazier at his place of employment. Petitioner stated that his attorney had requested the names of the officers prior to trial, but that the prosecutor had not provided this information. (See R–15 at 6.111/7–6.115/17; R–16 at 7.65/18–7.70/16.) Significantly, no police officer testified at trial with respect to this interview; Frazier's version of the meeting was uncorroborated.

the same arguments as those presented to the state appellate courts. In his petition, Merritt suggested the following possibility:

. . . Under the circumstances, it is simply not believable that the police would not have filed a report if Frazier, an eye-witness, had identified two suspects in the killing of Patrolman Gleason. As of the date of that meeting, the police apparently had only one identified suspect and there was much documentation by way of reports and signed statements with respect to that identification.

While we accept for the time being the State's version (finally disclosed to the judge but not the jury) that no report was prepared, there is of course another possibility, *i. e.,* that a report was prepared in which is [sic] is clear that Frazier did not implication [sic] petitioner and thereafter that report was made to disappear because it was inconsistent with Frazier's August 16th statement.

(Petition for a Writ of Habeas Corpus at 6 n.2) [16]

Following an evidentiary hearing on December 28, 1979, this court ordered respondents to search the records of the New Jersey State Police, the Union County Prosecutor's Office and the Plainfield Police Department for the purpose of locating any written report or memorandum concerning any police interview with Donald Frazier prior to the written statement of August 16, 1967. The following document was discovered as a result of that search: a surveillance record dated July 31, 1967 prepared by Detective Richard Mason of the Union County Prosecutor's Office and Detective Thomas Walker of the New Jersey State Police in which the officers state:

Interviewed Donald Frazier of 124 Plainfield Ave., Plainfield, New Jersey at his Place of business, Colbath's Disposal Service, South Plainfield, New Jersey. *Donald stated that he did not want to get involved in the murder investigation but he did see the Officer being beaten. He*

*sta[t]ed that there was a lot of strangers in the group that was assaulting the Officer.* Pictures will be shown to Mr. Frazier by the aforementioned Office[r]s on 8/1/67 in South Plainfield.

(Emphasis added.) (Full document reproduced as "Appendix B" infra.)

It is petitioner's contention that this report, which was specifically requested prior to trial and again during the pretrial hearing, conflicts with Frazier's testimony that he had advised the officers at the time of the July interview that he knew some of the persons who had participated in the attack and that he specifically identified petitioner as one of the assailants. Petitioner argues that the State suppressed exculpatory material in violation of the principles established in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and that his conviction should be set aside.

Respondents deny that the prosecutor withheld exculpatory evidence, and argue that petitioner had waived his right to raise this issue by way of a petition for federal habeas relief. Moreover, respondents contend that petitioner has failed to exhaust available state judicial remedies as required by 28 U.S.C. § 2254.

## II

### A. *Exhaustion of Remedies.*

In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the United States Supreme Court discussed the circumstances under which a federal court should conduct an evidentiary hearing to resolve disputed issues of fact raised in a petition for habeas corpus. The Court noted initially that

a narrow view of the hearing power would totally subvert Congress' specific aim in passing the Act of February 5, 1867, of affording state prisoners a forum in the federal trial courts for the determination of claims of detention in violation of the Constitution. The language of

---

16. Petitioner made this same argument in his motion for remand and his petition for certification, both of which were denied.

Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary.

*Id.* at 312, 83 S.Ct. at 757. It then proceeded to discuss the situations in which the exercise of the hearing power would be mandatory.[17] One such circumstance was described as follows:

> If, for any reason not attributable to the inexcusable neglect of petitioner . . evidence crucial to the adequate consideration of the constitutional claim was not developed at the state hearing, a federal hearing is compelled.
>
> \*      \*      \*      \*      \*      \*
>
> . . . And if for some justifiable reason he was previously unable to assert his rights or was unaware of the significance of relevant facts, it is neither necessary nor reasonable to deny him all opportunity of obtaining judicial relief.

*Id.* at 317, 83 S.Ct. at 759.[18]  *See* 28 U.S.C. § 2254(d).

█ Respondents do not challenge the propriety of the evidentiary hearing conducted by this court on December 28, 1979. Rather, the State argues that "[a]lthough petitioner has brought his allegation of a *Brady* violation before the New Jersey courts on direct appeal, the courts of New Jersey have not had the aid of the July 31, 1967 police report, discovered subsequent to the evidentiary hearing of December 28, 1979, when reviewing the *Brady* claim." (Respondents' January 22, 1980 Letter Memorandum at 2) Thus, respondents contend that the state courts should be given the first opportunity to evaluate the signifi-

cance of the new evidential material, and to conduct further hearings, if necessary, with respect to issues arising as a result of the discovery of this evidence:

28 U.S.C. § 2254 provides in pertinent part:

> (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The considerations of comity and federalism underlying the exhaustion doctrine require that "the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always [endeavor] to do so in ways that will not unduly interfere with the legitimate activities of the States." *Francis v. Henderson,* 425 U.S. 536, 541–42, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149 (1976), *quoting Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Therefore, whether "available" state remedies have been "exhausted" is a threshold question in every case in which a state prisoner seeks federal habeas corpus relief.

---

**17.** The Court concluded that

> where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew.
>
> \*      \*      \*      \*      \*      \*
>
> . . . Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding.

372 U.S. at 312, 83 S.Ct. at 757.

**18.** The Court observed:

> . . . There is every reason to be confident that federal district judges, mindful of their delicate role in the maintenance of proper federal-state relations, will not abuse that discretion. We have no fear that the hearing power will be used to subvert the integrity of state criminal justice or to waste the time of the federal courts in the trial of frivolous claims.

372 U.S. at 318, 83 S.Ct. at 760.

In *Austin v. Swenson*, 522 F.2d 168 (8th Cir. 1975), a state prisoner sought federal habeas relief on the ground that the State had suppressed exculpatory material at trial, to wit: police reports of a witness' statement which cast doubt upon the identification of the petitioner by the victim of his alleged crime. At trial, the defendant had attempted to gain access to the reports by means of a subpoena. *Id.* at 169. However, the trial judge refused to permit such an examination. A challenge to that ruling was rejected on appeal to the state Supreme Court. *Id.*

The district court held an evidentiary hearing at which the exculpatory material was produced. However, the court refused to evaluate the significance of the evidence, concluding that the existence of the new evidence warranted dismissal of the petition under the exhaustion doctrine in order "to protect and encourage federal-state court comity." *Id.*

On appeal, the Eighth Circuit vacated the judgment of dismissal and remanded the matter to the district court with instructions to resolve the constitutional claims. After noting that the mere possibility of success in additional state proceedings does not bar federal habeas relief, *id.* at 170, *citing Roberts v. LaVallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967); *Wilwording v. Swenson*, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), the Court stated:

. . . Exhaustion does not require that all of the evidence shall have been submitted. Assuming the issue of favorable evidence to have been fairly raised in the state court, the federal court on habeas corpus review must determine whether there has been an adequate record upon which to review the constitutional issues. New evidence justifies an evidentiary hearing in the federal court, as was done in this case. *Townsend v. Sain*, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Absent a willful withholding of evidence by the defendant in the state proceeding, the requirement of exhaustion does not preclude the District Court from entertaining the issue previously raised in state court and deciding the habeas claim upon the basis of new evidence.

522 F.2d at 170. The Eighth Circuit went on to note that a state evidentiary hearing would be unnecessary:

The doctrine of exhaustion of state remedies is only a rule of comity and need not be mechanically applied where the state court, for procedural reasons, has once refused to pass upon the merits of the question. In any event, once jurisdiction is asserted and the federal district court has conducted a full evidentiary hearing, it would be a waste of judicial machinery to require a second evidentiary hearing by another court which exerts only concurrent jurisdiction.

*Id., quoting Losieau v. Sigler*, 421 F.2d 825, 828 (8th Cir. 1970). Since the constitutional issue was ripe for determination, the Court of Appeals held that it would be a waste of judicial resources for the district court to refuse to pass on the merits of the *Brady* claim. Of particular significance in the instant matter is the following statement by the Eighth Circuit:

This admission is qualified in respondent's brief before this Court in which it contends that the issues have been expanded and "elaborated" upon the basis of new evidence. It is, however, the new evidence presented at the federal hearing on the old issues which provides the elaboration. That information was supplied by the state and was not available to petitioner in the earlier proceedings. *A due respect for comity does not require that federal proceedings be halted each time the state produces additional evidence potentially favorable to the petitioner.*

522 F.2d at 170 n.5. (Emphasis added.)

Similarly, in *Roberts v. LaVallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967), the United States Supreme Court declined to rule that the mere possibility of a successful application to the state courts was sufficient to bar federal habeas relief. In *Roberts*, the defendant demanded a free transcript of a preliminary hearing for pur-

poses of preparation for trial. His request was denied, and his conviction affirmed by the Appellate Division of the New York Supreme Court. The New York Court of Appeals denied leave to appeal. The issue of the denial of the transcript was raised at each stage of these proceedings.

Roberts then applied for federal habeas relief, arguing that he had a federal constitutional right to a free transcript of his preliminary hearing. That petition was denied. Thereafter, the New York Court of Appeals decided that an indigent defendant had a constitutional right to a transcript of a preliminary hearing under both the federal and state constitutions. On appeal from the denial of petitioner's application for habeas relief, the Second Circuit, taking note of the intervening change in the law, dismissed the petition without prejudice, stating that "the question ought to be decided in favor of permitting a state court determination in the first instance."

On certiorari, the Supreme Court vacated the judgment of dismissal, noting that "Congress had not intended 'to require repetitious applications to state courts.'" *Id.* at 42, 88 S.Ct. at 196, *quoting Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). Continuing, the Court stated:

. . . This is not a case in which there is any substantial state interest in ruling once again on petitioner's case. We can conceive of no reason why the State would wish to burden its judicial calendar with a narrow issue the resolution of which is predetermined by established federal principles.

389 U.S. at 43, 88 S.Ct. at 196; *See Montos v. Smith*, 406 F.2d 1243 (5th Cir. 1969); *Green v. Wyrick*, 414 F.Supp. 343 (W.D. Mo.), *aff'd per curiam*, 542 F.2d 1178 (8th Cir. 1976); *Emmett v. Ricketts*, 397 F.Supp. 1025 (N.D.Ga.1975). *See also, United States ex rel. Gockley v. Myers*, 411 F.2d 216 (3d Cir.) (en banc), *cert. denied*, 396 U.S. 847, 90 S.Ct. 96, 24 L.Ed.2d 96 (1969).

█ In the instant case, no further factual determinations need be made, and no policy of comity or federalism will be served by deferring a determination of petitioner's *Brady* claim based on the July 31st report. Moreover, this issue is indeed "predetermined by established federal principles." *Roberts v. LaVallee, supra. See* discussion *infra.* Accordingly, I hold that petitioner has exhausted his state remedies as required by § 2254.[19]

**19.** The Third Circuit's decision in *United States ex rel. Fisher v. Driber*, 546 F.2d 18 (3d Cir. 1976) does not compel a contrary conclusion. In *Driber*, defense counsel requested a voir dire examination of an eyewitness who was about to make an in-court identification of the defendant. The trial judge denied the motion. After unsuccessful appeals, the defendant sought federal habeas relief, arguing that the in-court identification had been tainted by impermissibly suggestive pretrial identification procedures. The district court ordered an evidentiary hearing, but, because of the illness of the eyewitness, the hearing was cancelled and the court permitted a deposition *de bene esse* to be taken at the witness' home. The court's ruling denying the petition was based solely on the trial transcripts and this deposition. *Id.* at 21.

On appeal, the Third Circuit reversed and remanded "with a direction to the district court to grant the writ of habeas corpus unless within a reasonable time thereafter the State of New Jersey affords [the petitioner] a hearing of the type described by *Jackson v. Denno*, . . . the district court to retain jurisdiction of the cause." *Id.* at 23–24.

In *Driber*, unlike the present case, there had been no federal evidentiary hearing. Therefore, the district court was not placed in the position of being a "trial examiner" for the state courts. Rather, the facts of *Driber* placed it squarely within the situation recognized in *United States ex rel. Gockley v. Myers, supra*, that a federal court, prior to conducting an evidentiary hearing, "might in the first instance [remit the] petitioner to the State courts." 411 F.2d at 219.

In addition, the relief requested by the petitioner in *Driber* was a *Wade* hearing. In contrast, petitioner herein does not argue that he was deprived of some sort of constitutionally mandated hearing by the state trial court. Rather, Merritt claims that he was denied access to exculpatory evidence. Although he requested a hearing during the pendency of his appeal to the Appellate Division of the New Jersey Superior Court, this request was denied. This court ordered an evidentiary hearing pursuant to *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), which was held on December 28, 1979. Therefore, we are beyond the question of which sovereign should conduct the hearing. Rather, the question before me is whether it is for the federal or state

## B. Waiver

■ Respondents contend that petitioner has waived the right to raise the *Brady* claims in the present petition for federal habeas relief. Specifically, the State argues that "the issue of Donald Frazier's initial contacts with the police was not raised until the last of petitioner's three trials for the murder of Patrolman Gleason," and, as a result, petitioner is precluded from asserting any constitutional claim based on matters arising from the July interview. (January 24, 1980 Letter Memorandum at 2, *citing Wainwright v. Sykes*, 433 U.S. 536, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *United States v. Millet*, 559 F.2d 253 (5th Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 759 (1978)).

The record does not substantiate respondents' claim. The circumstances surrounding the July interview were raised during the prior two trials, although the matter was not pressed during those proceedings. (*See* Petitioner's January 30, 1980 Letter Memorandum at 1–5 & n.1.) More importantly, at the third trial defense counsel specifically requested all records relating to the July interview, and the prosecutor was ordered to produce the documents. Indeed, at the conclusion of the trial, Judge McKenzie stated:

> THE COURT: No, Mr. Rachmiel, we're talking about police reports as to what happened during the course of the investigation and if you're saying that perhaps there may be reports, it seems to me a rather late date to come forward with them.

(R–15 at 6.101/5–10) *See* note 14 *supra.* During the December 28, 1979 evidentiary hearing, the following colloquy took place between the court and the prosecutor:

> THE COURT: You recognize that if such a document as requested in [the August 19, 1977 letter from defense counsel] had existed that it was your obligation to supply it under the New Jersey Rules of Practice?

court to determine the merits of petitioner's *Brady* claim. As stated above, this is a legal determination which is "predetermined by es-

> THE WITNESS: Judge, I knew that before. As a prosecutor I knew that anything I had in the file which pertained to the trial would have to be forwarded to defense counsel without a request.

(Tr. at 56/16–25) Later in the hearing, the following exchange occurred:

> THE COURT: You recognize, I assume, that if there was a written memorandum of Frazier's version of events as told to Mason and Kitzler in July, that would be something that would have to be revealed to defense counsel?
>
> THE WITNESS: Absolutely, Judge. I would be the first one to forward it if I found it.
>
> THE COURT: If Frazier's version of the events he claims were observed on July 12th, 1967 [sic] as told to Mason and Kitzler then was different from a version he gave on the witness stand, it would be crucial, wouldn't it?
>
> THE WITNESS: Absolutely, Judge. I was well aware of Brady and other State court decisions. I would have revealed any information, either exculpatory or inculpatory that I had. . . .

(Tr. at 65/11–66/5) The *Brady* claims asserted in the instant petition, which challenges petitioner's incarceration following his conviction in the third trial, were timely raised and vigorously pursued both at trial and throughout the various stages of appeal. Petitioner was represented by a different attorney at each of his three trials, and although the issue of the lack of documentation of the July interview may have been pressed more strongly in the third trial, respondents fail to demonstrate how this constitutes a state procedural default within the meaning of *Wainwright v. Sykes, supra.* On the facts of this case, where defense counsel made numerous efforts to obtain information concerning the July interview at Frazier's place of employment, the State will not now be heard to challenge petitioner's right to raise the *Brady* claims.

tablished federal principles" and is appropriate for consideration by this court.

## C. Failure to Disclose Exculpatory Evidence.

The rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) is as follows: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. The constitutional obligation to provide exculpatory evidence is not measured by the moral culpability of the prosecutor, since the prosecutor is charged with knowledge of the significance of evidence in his file "even if he has actually overlooked it." *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). It is the character of the evidence, not the character of the prosecutor, that is determinative of the question of whether the suppression of evidence results in constitutional error. *Id.*

 In the instant case, the evidence which was not disclosed to petitioner related to the credibility of Donald Frazier, the sole witness who implicated Merritt in the murder of Gleason, and a witness whom the Appellate Division twice characterized as being "in many respects . . . unreliable." (R–3 at Ra15, Ra18).[20] It is established that evidence impeaching the testimony of a prosecution witness falls within the *Brady* rule "when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence." *United States ex rel. Marzeno v. Gengler*, 574 F.2d 730, 735 (3d Cir. 1978), *citing Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Dansker*, 565 F.2d 1262 (3d Cir. 1977), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978); *United States v. McCrane*, 547 F.2d 204 (3d Cir. 1976).

Frazier testified at trial that he informed the officers during the interview at his place of employment that he knew some of the persons who had participated in the beatings and that he named petitioner as one of the individuals who was involved in the incident.[21] However, the July 31st police report, recently revealed for the first time in 12 years, establishes that Frazier, far from implicating petitioner in Gleason's murder, told the police that there were "a lot of strangers" in the group that assaulted the patrolman, and that he did not want to get involved in the investigation. Petitioner's name is nowhere mentioned in this report.[22] Since it is clear that petitioner's conviction rested almost entirely on the testimony of Frazier, and the July 31st report could have been used to cast substantial doubt on Frazier's credibility (especially since Frazier's account of the July interview was uncorroborated; *see* note 15 *supra*), this report constitutes exculpatory evidence within the meaning of *Brady. Giglio v. United States, supra; United States ex rel. Marzeno v. Gengler, supra; United States v. McCrane, supra.*[23]

---

**20.** The Appellate Division also stated that Frazier's testimony was "flimsy and questionable."

**21.** As mentioned previously, Frazier testified at trial, and stated in his August 16th statement, that he had played baseball with petitioner and clearly recognized him on the day of Gleason's death.

**22.** Significantly, Merritt's name also did not appear on the progress report dated August 11, 1967 in which the detectives overseeing the Gleason murder investigation listed those persons who had been "identified as participants in the murder of Ptl. Gleason." (P–1; *see* Tr. of December 28, 1979 Evidentiary Hearing at 38/18–40/6.)

**23.** In *United States v. McCrane, supra*, the defendant was charged with assisting various companies in the preparation of fraudulent income tax returns. Specifically, the defendant solicited political contributions in the course of his duties as finance chairman for a gubernatorial candidate. For some of these contributions, he arranged the issuance of fictitious invoices for advertising services to disguise the payments as business expenses and to enable the contributor to deduct the payment on its income tax return.

*Defendant's convictions on two counts of the indictment were based entirely on the testimony of one witness, the president of one of the aforementioned contributors.* Prior to trial, the defendant had requested disclosure of exculpatory material and "material which may be used to impeach prosecution witnesses." 547 F.2d at 207. In reply, the Government indicated that it had no such material, but that it recog-

However, a finding that evidence is exculpatory in nature does not end the inquiry, for "[o]nce evidence is found to be exculpatory, the question then focuses on whether the omitted evidence was material to the finding of guilt in the . . . trial." *United States ex rel. Marzeno v. Gengler,* 574 F.2d at 735. The United States Supreme Court addressed the question of materiality in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and recognized three discrete factual situations in which this issue may arise. These situations, and the analysis to be employed by a reviewing court to determine the materiality of suppressed evidence, were described by the Court of Appeals for the Third Circuit as follows:

> The first involves the situation in which a prosecution witness has given perjurious testimony and the prosecution knew or should have known of the falsity of the statements. In such cases, which might involve "a corruption of the truth-seeking function of the trial process," 427 U.S. at 104, 96 S.Ct. at 2397, the undisclosed information is material if "there is any reasonable likelihood that the false testi-

mony could have affected the judgment of the jury." *Id.* at 103, 96 S.Ct. at 2397.

> The second problematic situation, typified by the *Brady* case, arises when the defendant has made a specific request for information and the prosecution has failed to respond by revealing the requested information to the defendant. In such cases, the *Agurs* court noted, "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." 427 U.S. at 106, 96 S.Ct. at 2399. *In determining the materiality of a specific request, a reviewing court must determine whether "the suppressed evidence might have affected the outcome of the trial." Id.* at 104, 96 S.Ct. at 2398. *See Government of the Virgin Islands v. Testamark,* 570 F.2d 1162, No. 77–1567 (3d Cir. Jan. 10, 1978).

> Third, when no request is made by the defendant or only a general request is made, information not revealed by the prosecutor will be held to be material only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Agurs, supra,* 427 U.S. at 112, 96 S.Ct. at 2401. *See United States v. McCrane, supra.*

nized its "continuing obligation" to disclose any exculpatory evidence that it may acquire during the proceedings. *Id.*

Four days after the conclusion of trial, the defendant learned that the U. S. Attorney's office had written a number of letters to prospective customers of the witness. These letters described the witness' cooperation with the Government during the investigation, and concluded with the following paragraph:

> This office brings these facts to your attention for your consideration as to whether Bellante, Clauss, Miller & Nolan, Inc. should be barred from further bidding on state work. On previous occasions we have expressed our concern that individuals that cooperate with the United States Grand Jury pursuant to a grant of immunity should not be penalized for telling the truth. It is in this context that I bring Mr. Bellante's cooperation to your attention for your consideration in reaching a final determination of the matter before you. In the final analysis, this determination must be made by your office and we do not in any way intend to interfere with your discretion in this matter.

*United States v. McCrane,* 527 F.2d 906, 910 & n.4 (3d Cir. 1975), *vacated and remanded,* 427 U.S. 909, 96 S.Ct. 3197, 49 L.Ed.2d 1202 (1976), for further consideration in light of *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), *reaffirmed on remand, United States v. McCrane,* 547 F.2d 204 (3d Cir. 1976).

The Court of Appeals for the Third Circuit, while noting that the letters could be viewed as mere "factual recitations containing no evidence of any understanding between the witness and the prosecutors office or any expectation of favor," nevertheless concluded that the correspondence constituted *Brady* material which should have been disclosed· to the defendant during trial. The Court stated that the witness' testimony was a "slender reed indeed to support the [G]overnment's case," and that evidence of preferential treatment by the Government or other impeachment evidence could have been the "decisive factor in the jury's acceptance or rejection" of the witness' testimony. 547 F.2d at 206. The Third Circuit vacated the convictions on the counts on which the witness' testimony supplied the only evidence. *Id.* at 208.

*United States ex rel. Marzeno v. Gengler,* 574 F.2d at 735–36. (Footnote omitted) (Emphasis added) The standards of materiality set forth in *Agurs* must be applied, and the significance of nondisclosure in a particular case must be evaluated, in the context of the entire record.

In the instant case, petitioner specifically requested a copy of any police report or memorandum memorializing the interview at petitioner's place of employment, and the prosecutor stated that no such report was prepared, or that the report, if made, could not be located. Therefore, the materiality of this evidence must be examined under the second, or "specific request," standard of *Agurs,* and my task is to determine whether the omitted evidence "might have affected the outcome of the trial."

In certain cases, what appears to be relatively minor information may justify vacating a conviction, where the undisclosed evidence "directly casts doubt on the evidence presented to the jury and on which the jury relied in its finding of guilt." *United States ex rel. Marzeno v. Gengler,* 574 F.2d at 736, *citing United States v. McCrane, supra.* As noted previously, the State conceded that its case rested entirely on the testimony of Donald Frazier. If his credibility failed, the State's case failed. He was characterized by the Appellate Division as being "unreliable," and his testimony, fraught with inconsistencies, was accurately described as "flimsy" and "questionable." In this posture, the July 31st report might very well have been the decisive factor in the jury's acceptance or rejection of Frazier's testimony. After a careful review of the record, it is my conclusion that the undisclosed evidence "might have affected the outcome of the trial" and was therefore material. *See United States v. McCrane, supra.*[24]

---

24. The State now claims that the police conducted *two* interviews of Frazier at his place of employment. In an Affidavit filed on January 11, 1980, Lieutenant Richard J. Mason of the Union County Prosecutor's Office states that the July 31st report has "refreshed his recollection" concerning the investigation, and that he visited the Colbath Disposal Service on two occasions. Mason claims that he was accompanied by Detective Thomas Walker of the New Jersey State Police during the first interview, and by Detective Robert Kitzler of the State Police during the second.

Mason's recollection appears to have been triggered by the following sentence in the July 31st report: "Pictures will be shown to Mr. Frazier by the aforementioned Office[r]s on 8/1/67 in South Plainfield." However, Mason gives no indication of what transpired during this alleged second meeting, nor was any record found of this interview. More importantly, there is nothing in the entire trial transcript to suggest that Frazier was interviewed twice at his place of employment.

Even assuming, *arguendo,* that a second interview did take place, the July 31st report still compels the conclusion that the conviction should be set aside. The contents of that report are fundamentally inconsistent with Frazier's testimony at trial. These inconsistencies cannot be "cured" by the statements of someone who neither witnessed the attack on Gleason nor testified at trial with respect to the interview(s). It is for the jury in petitioner's new trial, if any, to determine whether such a second meeting took place and, if so, what happened at that meeting.

I note parenthetically that the report discloses the officers' intention to return to Frazier's place of employment with some photographs. If this meeting did occur, Frazier's credibility is open to question on yet another aspect of his testimony. On cross examination, he stated:

Q  What did you tell the police when they came to your job?
A  I told them I knew two of the people who was involved in this incident.
Q  Now, did they have their albums? Did they show you anything at that time? Did they show you any album books at that time? Did they show you any pictures at that time?
A  I can't remember that.
Q  Think about it, Mr. Frazier. I ask you again to think about when you were on the job when the police arrived, did they show you any albums or pictures when they came to your job that Thursday or whenever? Did they show you any pictures?
A  I don't think they did. No.
Q  So we're clear on what you're saying, you're saying then that you don't think that when the police came to your job they showed you any pictures from the album book, right?

\*     \*     \*     \*     \*     \*

THE COURT:  Is that your testimony, sir?
THE WITNESS:  Yes, your Honor.
(R–11 at 3.55/22–3.57/11) Later, Frazier made the following statements:
Q  When the police came to your job,—the police came to your job. Did you tell the police when they came to your job about this fellow, George Hollis?

Based on the foregoing discussion, I hold that the failure to disclose the July 31st report constituted a violation of petitioner's right to due process of law under the fourteenth amendment to the United States Constitution and deprived him of a fair trial.[25] Accordingly, this court will issue a conditional writ of habeas corpus directing respondents Sidney Hicks, Superintendent of the New Jersey State Prison at Rahway, and the State of New Jersey to release petitioner from custody unless petitioner is afforded a new trial within 60 days of the date of the issuance of the writ. An order in conformity with this opinion is being filed herewith.*

## APPENDIX A

**ASHLEY & CHARLES**
COUNSELLORS AT LAW
24 COMMERCE STREET
NEWARK, N. J. 07102

THOMAS R. ASHLEY
JOSEPH CHARLES

August 19, 1977

Joel I. Rachmeil, Esq.
Union County Prosecutor's Office
Court House
Elizabeth, New Jersey

Re:  State v. George Merritt

Dear Mr. Rachmeil:

Having reviewed the discovery I am concerned that I do not have any police reports with regard to any interviews with Don Frazier. I am most concerned that, according to the testimony of Don Frazier, he was interviewed by the police approximately three weeks prior to the time that he gave his statement. At that interview he apparently states that he identified George Merritt yet there are no police reports and further the photograph which I saw in your office has no markings or other indications that Mr. Frazier ever identified George Merritt at that time.

---

A  Yes, I did.
Q  You told them about that?
A  Yes.
Q  But you don't remember whether they showed you this book?
A  They didn't show me that book until I got down headquarters and that's when they asked me to go through it and I already told them about I knew Donald Jones and George Hollis before I looked into that book.

(*Id.* at 3.83/5–16) Moreover, there remains the question of why petitioner's name was not included in the August 11th list of suspects. *See* note 22 *supra.*

25.  In light of my conclusion that the nonproduction of the July 31st report, without more, requires that the writ be granted, I need not reach the other issues raised in Merritt's petition. However, petitioner's contention that the prosecutor exercised his peremptory challenges in a racially discriminatory manner, that the state court improperly permitted the admission of gruesome and inflammatory photographs, and that he was not given his *Miranda* warnings before making his post-arrest statement, appear to be without merit. I offer no opinion on petitioner's other *Brady* claims.

* Since the date of the filing of the opinion and the issuance of the conditional writ of habeas corpus in this matter, the time for appeal has run, and the State has decided not to retry petitioner for a fourth time for the murder of Patrolman Gleason. On April 25, 1980, the Honorable V. William DiBuono, A. J. S. C., dismissed the indictment against petitioner on the application of the Union County Prosecutor on behalf of the State.

If there are any police records whatsoever (memoranda, police reports, internal documents, etc.) I sincerely request that they be furnished to me.

I am mindful that I met you at your office on Thursday at which time you cooperated fully in the exchange of discovery, but I further request of you, after reading the transcript, that you endeavor to give me some documentation with respect to Frazier's initial interview by the police.

I am presently attempting to obtain the Grand Jury testimony of Don Frazier. If I am able to procure same I will furnish you with a copy of his testimony immediately.

Thank you for your anticipated cooperation.

Very truly yours,

Thomas R. Ashley

TRA:J

## APPENDIX B

PLAINFIELD, NEW JERSEY

POLICE DEPARTMENT

SURVEILLANCE RECORD

Date:       July 31st, 1967

Day:        Monday

Officer:    Det.s Mason and Walker

Premises and/or persons under surveillance:_____

_____ Homicide Investigation _____

Reason:     Officer John Gleason _____

Time:   From:_____ To:_____

Narrative of Observations:

Interviewed Donald Frazier of 124 Plainfield Ave., Plainfield, New Jersey at his Place of business, Colbath's Disposal Service, South Plainfield, New Jersey. Donald stated that he did not want to get involved in the murder investigation but he did see the Officer being beaten. He stated that there was a lot of strangers in the group that was assaulting the Officer. Pictures will be shown to Mr. Frazier by the aforementioned Office s on 8/1/67 in South Plainfield.